1823.

WALTON
v.
WALTON.

J. WALTON *against* H. WALTON, executor, &c.

A bequest of all the testator's right, interest and property, in thirty shares in the *Bank of the United States of America*—is a *specific* legacy.

Where, before the testator's death, the charter of the *United States Bank* expired, and all its property and funds were conveyed to trustees, who divided the funds received by them, from time to time, among the stockholders, and the testator received the dividends on the shares devised, but did not sell or dispose of the shares: *Held,* that this was an *ademption* of the legacy, *pro tanto* only ; and the legatee was entitled to any dividends after the testator's death ; the variation in the testator's interest in the stock or fund, by operation of law, not being any extinguishment or ademption of the legacy.

So, where *two* shares in the *Western Inland Lock Navigation Company* were bequeathed to the plaintiff; and in the lifetime of the testator, the shares, by some arrangement, were increased to the number of *six*, and the stock, under an act of the Legislature, became vested in the state, and a certain sum was to be paid to the stockholders, as a compensation for its value: *Held,* that the legacy was not adeemed, or extinguished.

A devise of land once revoked, expressly or by implication, cannot be restored, without a republication of the will.

If a testator conveys the estate devised, though he takes it back again by the same instrument, or otherwise, it is a revocation at law and in equity ; even though he did not intend to revoke his will.

Where the testator entered into written contracts for the sale of parts of a tract of land devised by his will: *Held,* that the contracts for the sale of the lots by the testator, were a revocation of the devise *pro tanto,* in equity, though not at law. And though a contract for the sale of land devised, is rescinded by the mutual consent of the purchaser and testator, so that the latter is restored to his former title, and dies seised of the same estate, the devise is, notwithstanding, absolutely revoked.

*June 7th and July 2d.*

GERARD WALTON, by his last will, dated *August* 30th, 1795, devised, among other things, as follows : "I give and devise my house, at present occupied by me, on the south side of *Pearl-street,* &c. unto my nephew, (the

plaintiff,) in fee." "I give and bequeath to him all my household furniture," &c. "*Item*, I give and bequeath to my said nephew, all my right, interest and property in *thirty shares*, which I own in the *Bank of the United States;* and in *four shares*, which I own in the companies of the northern and western inland lock navigation." "*Item*, I give and devise all my share, right, title and interest in and to two certain tracts of land, the one of which tracts is 12,000 acres, in the county of *Herkimer*, and the other tract is in the county of *Otsego*, between the *Delaware* and *Susquehannah* rivers, to my nephew, (the plaintiff,) in fee, chargeable with the payment of 30 pounds a year to *Jane Oliver*," &c. "All the rest and residue of my estate, both real and personal, I give and bequeath to my brother *Abraham Walton*, and my nephew, (the defendant,) to be divided between them, chargeable with my debts and funeral expenses." The testator died *May* 18th, 1821; *Abraham W.*, one of the executors, died before the testator; and the defendant, the other executor, proved the will, and paid the debts and legacies. The charter of the *Bank of the United States* expired by its own limitation, on the 3d of *March*, 1811, and its property and funds were conveyed to trustees, who divided them among the stockholders, from time to time, as they were received. The testator received the dividends on his thirty shares; but never disposed of them, or received any other payment, than the dividends, and which were so received by him, from necessity. Since the death of the testator, no further dividends, on the shares of stock, have been made; but the pleadings stated that some would probably be made. By proceedings under the act of the Legislature, respecting navigable communications, &c. passed the 15th of *April*, 1817, the property and rights of the *Western Inland Lock Navigation Company* became vested in the state, and by appraisement, a large sum was awarded to the testator in his life time; and the defendant, in his answer, admitted that he received 327 dollars and

27 cents, from the treasurer of the company, standing to the credit, or which ought to have stood to the credit of the testator, at or before the time of his death, and due to him for six shares, substituted for two shares which he before held, and which were the only shares held by the testator in the company. That the testator, at the time of his death, owned two shares in the *Northern Inland Lock Navigation Company,* which the defendant believed to be of little value, and which he was willing to assign to the plaintiff. The testator, after the date of his will, caused the lands on the *Delaware* and *Susquehannah* rivers, devised to the plaintiff, to be surveyed and divided into lots, for the purpose of sale; and entered into written contracts, for the sale of four several parcels of lands, in 1809, 1812, 1815, and 1816, and received part of the price from each purchaser, and his bond for the residue of the purchase money; which contracts were existing in full force at the time of the testator's death, and were admitted by the defendant to be in his possession. The testator, in his lifetime, sold another part of the same land, lot No. 4., and received the whole price, and executed a conveyance to the purchaser, in fee. On the 6th of *December,* 1807, the testator contracted with *Seth C. Baldwin* for the sale of lot No. 17, part of the same land, being 211 acres, at five dollars per acre. He received three hundred dollars of the purchase money; but the contract was cancelled by the mutual consent of the parties; and the money paid was credited to *B.* on another agreement, and the testator remained seised of lot 17, at the time of his death. The plaintiff alleged, that he was seised of the same estate, in lot No. 17, as the testator held at his death. The defendant insisted, that the plaintiff had no right or interest in the dividends due, or to become due, on the bank shares; nor in the moneys received by the defendant on account of the shares of the testator in the inland lock navigation companies; and that those legacies were adeemed in the lifetime of the testator;

and that the plaintiff had no interest in the lots of land contracted by the testator to be sold, nor in the contracts, nor in the lot No. 17; as the will, as to those lots, was, by the acts of the testator, revoked. The bill *prayed*, that the defendant might be decreed to account for the moneys received on account of the interest of the testator in the inland lock navigation shares, and on account of contracts relating to the sale of the lands devised; and that the contracts and agreements be decreed to be delivered and assigned to the plaintiff, and he be empowered by the defendant to receive the dividends due on the bank shares, and for general relief.

1823.

WALTON
v.
WALTON.

The defendant, in his answer, admitted the facts above stated.

*June* 7, 1823. The cause was brought to a hearing on the bill and answer.

*J. O. Hoffman*, for the plaintiff. He cited 2 *Bro. C. C.* 108. 2 *Vesey*, jun. 639. 2 *Cox*, 180. 4 *Vesey*, 568. 2 *Vesey*, 310. 1 *Bro.* 129. 9 *Vesey*, 360. 2 *Cox*, 184. 2 *Vesey*, 601. 624. 5 *Vesey*, 654. 2 *Vesey*, 221. 2 *Ves. & Beam.* 385. 1 *Vesey*, 255.; and to show that the costs of the suit ought, at all events, to come out of the residuary fund, and not out of the fund claimed by the plaintiff, he cited 9 *Vesey*, 181. 3 *Bro.* 25. 4 *Johns. Ch. Rep.* 608.

*Harison*, contra. He cited 2 *Vesey*, 218. 16 *Vesey*, 197. 1 *Bro.* 161. 15 *Vesey*, 236. 238. *Dickens' Rep.* 563. 10 *Vesey*, 597. 19 *Vesey*, 170.

THE CHANCELLOR. The first bequest on which a question has arisen, as to the ademption, is of "all the testator's right, interest and property, in 30 shares, which he then owned in the *Bank of the United States*, and in four shares which he owned in the companies of the northern and western inland lock navigation."

1823.

WALTON
v.
WALTON.

The charter of the bank expired subsequent to the date of the will, and the property of the bank was conveyed to trustees, to be collected and disposed of for the benefit of those interested in the bank.   The funds, from time to time, received by the trustees, were divided among the stock-holders ;  and the testator, in his lifetime, received certain dividends on the stock, but he never made any sale of the shares, and no dividends have been made since his death, though further dividends may be expected.

A bequest of all the testator's right, interest and property in *thirty* shares in the *Bank of the United States,* is a *specific* legacy.

Upon this point, I am of opinion that these bank shares were given as a specific legacy.   The testator evidently meant to give those indentical shares, whether they were worth more or less, and not the value of them in money.   This would appear to be a very clear point ; yet in considering this doctrine of ademption, it is difficult sometimes to perceive the distinction which is endeavoured to be kept

Distinction between a *specific* and a general pecuniary legacy.

up through all the cases, between specific and general pecuniary legacies.   Where a debt or specific chattel is bequeathed, (*legatum nominis vel debiti,*) the specific legacy is extinguished in the lifetime of the testator, by the extinguishment of the thing itself, as by payment of the debt, or

A pecuniary or demonstrative legacy, to be paid out of a particular fund, is not adeemed by the extinguishment of the fund.

by the sale or conversion of the chattel.   But the ademption does not apply to a pecuniary or demonstrative legacy, which is general in its nature, though a particular fund be pointed out by the will to satisfy it.   If the fund fails, such a legacy is to be made good out of the general assets, as the fund is designated only as the most convenient means by which to discharge it, and becomes descriptive of the amount or value of the gift.

We have an example of this kind of money legacy given in the civil law, and of the sound principle upon which the distinction is supported.   The testator gave to *Pamphila* 400 *aurei* or pieces of gold, and referred to a debt which *Julius,* his agent, owed him, and to his property in the army, and to his cash.   (*Aureos quadringentos Pamphilæ dari volo, ita ut infra scriptum est ; ab Julio auctore aureos,*

*tot : et in castris quos habeo, tot : et in numerato quos habeo, tot.*) He died without altering his will, but after he had converted all that property to other uses; and the question was, whether the legacy was due. The answer of *Julian,* the civilian, was, that the testator intended only to point out to his heirs, the funds from which the legacy could most easily be drawn, without intending to annex a condition to a pure gift, and that the legacy was, consequently, to be paid. (*Dig.* 30. 1. 96. *De Legatis.*)

The cases in the *English* books turn on very refined distinctions between a specific and a pure legacy. Thus, for instance, where the testator gave to his niece 500 *pounds, which Lady C. owed him by bond ;* (*Pawlet's* case, *T. Raym.* 335.) or where the testator enumerated his mortgages, bonds and notes, and after giving an annuity out of the annual interest, *directed* his *mortgages, bonds and notes, stating the amount, to be vested in trustees for charitable uses;* (*Attorney General* v. *Parkin, Amb.* 566.) or where he gave 1400 *pounds for which he had sold his estate that day ;* (*Carteret* v. *Carteret,* cited in 2 *Bro.* 114.) or where he gave the money arising on a bill of exchange for 1500 *pounds ;* (*Coleman* v. *Coleman,* 2 *Vesey,* jun. 639.) in all these cases, the receipt of the debt by the testator, was held to be no ademption, because the legacies were considered as pecuniary and not specific, notwithstanding a reference was made to a particular part of the estate, as the part out of which the testator thought it most convenient they should be paid. The Courts are so desirous of construing the bequest to be general, that if there be the least opening to imagine the testator meant to give a sum of money, and referred to a particular fund *only,* as that out of which he meant it to be paid, it shall be construed pecuniary, so that the legacy may not be defeated by the destruction of the security.

On the other hand, in the case of a bequest of *the interest of a bond of 3,500 pounds, for life, to B., and the princi-*

1823.

WALTON
v.
WALTON.

But where the legacy is *specific*, a receipt of the money, or a sale of the chattel by the testator, is an ademption of the legacy.

*pal, on her decease, to C. ; (Ashburner v. M'Guire, 2 Bro.* 108.) or where the testator *bequeathed the residue* (after deducting 500 pounds) *of the money owing to him by Sir H. M. ; (Rider v. Wager, 2 P. Wms. 328.)* or 8000 *pounds, the amount of a banker's note ; (Chaworth v. Beech, 4 Vesey, 555.)* or the *interest of 300 pounds upon bond, to the legatee for life, and after her death he bequeathed over the principal and interest ; (Juner v. Johnson, 4 Vesey, 568.)* or *where he gave all the stock he had in the three per cents, being about 5000 pounds ; (Humphreys v. Humphreys, 2 Cox, 184.) or the sum or sums of money which his executors might receive on a note of 400 pounds ; (Fryer v. Morris, 9 Vesey, 360.)* in all these cases, the legacies were held to be specific, and a receipt of the money by the testator an ademption of the legacy. The reasoning on this subject is, that if the legacy is meant to consist of the *security*, it is specific, though the testator begins by giving the sum due upon it. A legacy of a debt, unless there is ground for considering it a legacy of money, and that the security is referred to as the best mode of paying it out of the assets, is as much specific as the legacy of a horse, or any moveable chattel whatever. If the specific thing is disposed of or extinguished, the legacy is gone. Lord *Thurlow* said, in *Stanley* v. *Potter,* (2 *Cox,* 180.) that the question, in these cases, did not turn on the intention of the testator, and that the idea of proceeding on the *animus adimendi* had introduced confusion. Where the testator gives a specific chattel in specie, the ademption follows, of course, on a sale, or change, or destruction of the chattel, and the ademption becomes a rule of law, and not a question of intention. But I apprehend the words of Lord *Thurlow* are to be taken with considerable qualification ; and that it is essentially a question of intention, when we are inquiring into the character of the legacy, upon the distinction taken in the civil law, between a demonstrative legacy, where the testator gives a general legacy, but points out the fund to

The *intention* of the testator becomes the essential inquiry, in ascertaining the character of the legacy.

satisfy it, and where he bequeaths a specific debt. In *Coleman* v. *Coleman*, Lord *Loughborough* puts the question of general or specific legacy entirely on intention.

But it is unnecessary to examine the decisions further on this point. The present case, as to the bank shares, is one to which the doctrine of ademption applies. It is impossible to mistake the construction of the will, or to consider the legacy other than a specific one, and that being granted, it follows, of course, that the legacy was adeemed *pro tanto*, or as far as the testator received the dividends. And I think it is equally certain, that the legacy of the shares was not wholly adeemed, or the legacy destroyed or extinguished by the variation of the testator's interest in those shares, owing to the dissolution of the charter. The fund was varied, and differently arranged, and diminished in value by operation of law, but not destroyed, nor its identity lost. In *Backwell* v. *Child*, (*Amb.* 260.) a partner by will bequeathed a certain proportion of the profits of the partnership, and afterwards the partnership expired, and was renewed with a variation as to the amount of the interest of the partners; yet it was held, that the renewal of the articles was not an ademption or revocation of the will. A case still stronger and more analogous, is that of *Ashburner* v. *M'Guire*, already mentioned. The testator bequeathed to his sister, for life, the interest of a bond due him, and he gave the principal, on her death, to her children. The debtor became a bankrupt, and the testator proved the debt under the commission, and received a dividend, and died. Lord *Thurlow* decreed against the administrator and residuary legatees, that the bond should be delivered to the sister and her children, that they might receive the future dividends of the bankrupt's estate. The legacy was considered adeemed so far only as the dividend had been received by the testator; and the Chancellor held, as Lord *Camden* and others had held before him, that there was no ground for a distinction between a voluntary pay-

1823.
WALTON
v.
WALTON.

A legacy is not extinguished or destroyed by a variation of the testator's interest, produced by operation of law; as where the bequest is of certain bank shares, and the charter of the bank expires, and the funds are conveyed to trustees, who divided the moneys received among the stockholders; and if the testator receives part of the dividends from the trustees, in his lifetime, it is an *ademption pro tanto* only.

ment and one coerced by suit or demand. In both cases, the legacy of the debt, so far as payment had been made, was extinguished. But though the value of the debt had become greatly impaired by the bankruptcy of the debtor, and his estate had passed, by act of law, into the hands of trustees, to be distributed according to prescribed rules, the legatee was entitled to what remained of the debt. Upon the same principle, the plaintiff, in this case, must be entitled to the future dividends, if any, upon the testator's "right, interest and property in the 30 shares."

The same observations will apply to the shares in the lock navigation companies. The property of the *Western Inland Lock Navigation Company* was vested in the State, by an act of the Legislature, which assumed that interest, and provided for the assessment and payment to the company of the value of it. The two shares, which the testator owned in the western company, were, by some change in the stock, increased to six shares, but it was the same interest, and the defendant, as executor, has received, since the testator's death, towards payment of the compensation allowed by the State, the sum of 327 dollars and 27 cents. If the legacy was not adeemed by the assumption of the property by the State, the defendant is accountable for that sum to the plaintiff; and that it was not adeemed, is most apparent. The case of *Partridge* v. *Partridge*, (*Cases temp. Talbot*, 226.) is in point, and founded on a principle obviously just. *A.* devised, in that case, 1000 pounds South Sea stock, and an act of *Parliament* afterwards changed three-fourths of the capital stock into annuities. But Lord *Talbot* held, that this alteration of the stock did not work an ademption, for it was not to be presumed, that the testator's assent to the law was particularly given, or that he agreed to such a law in any other manner than what every other person is supposed to do. The same decision was made on a similar point by the Master of the Rolls, in *Bronsdon* v. *Winter.* (*Amb.* 57.) The defendant offers to

assign the two shares which the testator owned in the Northern Company, and denies that he ever refused to assign them.

2. The next branch of the case, relates to the lands devised to the plaintiff, lying between the *Delaware* and *Susquehannah* rivers.

The testator, subsequent to the date of the will, entered into contracts for the sale of four several parcels of these lands, and received part of the price in each case, and took a bond for the residue, and died leaving those contracts in full force. These contracts are set forth in the answer, and were binding upon the testator, and liable to be specifically enforced in equity; and I entertain no doubt that the devise, so far as those contracts of sale affected the lands devised, was revoked. The case of *Knollys* v. *Alcock*, (5 *Vesey*, 654.) is to this effect: The testator, by will, devised her undivided moiety of her *Berkshire* estate to *M.*, and afterwards, by agreement with her coparcener, contracted to divide their joint interest, and to allot the *Berkshire* estate to *K.* This was held by Lord *Loughborough* to be a revocation of that part of the devise, and the agreement was decreed to be specifically performed. The principle was, that where an estate is devised specifically, and is afterwards sold by the testator by a contract executory, the estate goes from the devisee, and the devise is revoked by the contract of sale. So again, in *Williams* v. *Owen*, (2 *Vesey*, jun. 601.) the Master of Rolls observed, that if a man articles for the sale of an estate that he has devised, it is, without doubt, a revocation in equity, though it is not at law, because a court of law cannot look at the articles with a view to a specific performance. In *Cotter* v. *Layer*, (2 *P. Wms.* 622.) Lord *King* held, that though a covenant or articles to sell or settle the land devised, do not at law revoke a will; yet, if entered into for a valuable consideration, they amount in equity to a conveyance and a revocation. He laid down the same rule in *Rider* v.

*Margin right:*

1823.

WALTON
v.
WALTON.

Where an estate, specifically devised, is sold by the testator, by an executory contract, it is a revocation of the devise, in equity; for the estate, from the time of the contract, is considered as the estate of the vendee.

*Wager;* (2 *P. Wms.* 332.) and Lord *Loughborough,* in *Bridges* v. *Dutchess of Chandos,* admitted the force and authority of these two cases. So again, in the case of *Mayer* v. *Gowland,* (*Dickens,* 563.) the testator devised a certain farm, and then entered into a contract with the defendant to sell it to him for 1500 pounds. It was insisted by the residuary legatees, that the testator meant, by the contract, to turn the land into personalty, and that as such they were entitled to it. In this opinion, Lord *Thurlow* concurred, and held that the agreement ought to be carried into execution, and the money arising from the sale to be considered as personal estate.

These cases are entirely sufficient to show the settlement of the rule, that a valid contract, for the sale of lands devised, is as much a revocation of the will in equity, as a legal conveyance of them would be at law. The estate, from the time of the contract, is considered as the real estate of the vendee. We may, therefore, safely conclude, that, as to the lands described in the contracts of sale, set forth in the answer, and which contracts were subsisting at the testator's death, there was a revocation of the devise; and the interest in these lands, and in the contracts relating to them, belongs to the residuary legatees under the will. The more embarrassing question arises as to the lot No. 17, mentioned in the pleadings. This lot was part of the lands devised to the plaintiff, and the testator afterwards contracted to sell it to *S. C. Baldwin,* and received part of the purchase money. At a subsequent period, this contract of sale was rescinded by the parties to it, and the money paid was credited to *Baldwin* on another transaction, and the testator continued seized of the lot to his death.

The question is, whether this contract of sale was also a revocation of the will *pro tanto,* seeing that it was afterwards rescinded.

In *Bennett* v. *Lord Tankerville,* (19 *Vesey,* 170. 178.)

a devise was held to be revoked by a contract of sale, though that contract was rescinded after the testator's death. But in that case, the contract was subsisting when the testator died, and this makes a material distinction between that and the present case.

Inoperative conveyances, which have failed for want of completion, or from incapacity in the grantee to take, have, in some cases, been held a revocation of a will at law. Lord *Kenyon* observed, in *Shove* v. *Pincke*, (5 *Term Rep.* 124.) that a conveyance, inadequate for the purpose intended, would amount, in point of law, to a revocation, if it showed an intention to revoke the will. A covehant to make a feoffment, and a letter of attorney to make livery, but no livery made, were held, in *Montague* v. *Jeffereys,* (1 *Rol. Abr.* 615.) to be a revocation of a will, as being acts inconsistent with it ; and Lord *Hardwicke* and Lord Ch. J. *Alvanley*, sitting in equity, have approved of this construction, as those acts imported an intention in the testator to revoke. (3 *Atk.* 73. 803. 7 *Vesey*, 370, 371. 373.) So a bargain and sale without enrolment, or a conveyance upon a consideration which happened to fail, or a will not executed according to the statute, or a disability in the grantee to take, are admitted by the same authorities to amount to a revocation. The great question, says Lord *Alvanley*, has been, whether inchoate acts, inconsistent, shall revoke ; but in all the cases it is admitted, that if the act gives power to destroy the will, though the act is not done, yet the will is revoked.

*A conveyance, inoperative for want of completion, or incapacity in the grantee, may amount to a revoca-. tion, if it shows the intention of the testator to revoke his will.*

The contract to sell lot No. 17, was binding upon the testator, and was, at the time, a revocation of the will as to that lot, for it was a conveyance in equity, and equity would have enforced it. The estate was, in contemplation of equity, the property of the vendee, and the purchase money the property of the vendor. The will was revoked because the estate was sold, and because the testator, by that contract, intended to revoke it ; and why should a sub-

*A devise of land once revoked, expressly or by implication, cannot be restored without a republication of the will.*

sequent recovery of the estate, by rescinding the contract, restore the will in equity without republication, when the taking back of the same estate, by a reconveyance, after a conveyance at law, will not do it? The rules as to revocation of wills are the same in law and equity; and as Lord *Loughborough* observed, in *Bridges* v. *Dutchess of Chandos*, the creation and transmission of estates, must be governed by the same law in both Courts. If a will be once absolutely revoked, whether directly or impliedly, it must be gone for ever. It cannot be restored without due republication.

The rules as to revocations of wills, are the same at law and in equity.

Without wishing to lose myself in the labyrinth of cases which have arisen on the subject of revocations, and especially after the discouraging picture which Lord Ch. J. *Eyre* gives of many of the cases, as being " a heap of heterogeneous instances, depending upon different principles, and huddled together without discrimination," I will look only into a few leading authorities, for the illustration of a strict principle of law, that if the testator afterwards conveys away the estate entirely, though he takes it back again by the same instrument, or by a declaration of uses, it is a revocation, because he once parted with the estate. Either an intention to revoke, or an alteration of the estate without such intention, will work a revocation.

In *Dister* v. *Dister*, (3 *Lev.* 108.) the C. B. held a devise revoked by a recovery to the uses of the devisor, because the estate was altered, though the testator took back the old use. And the same principle was admitted by the C. B. in *Darley* v. *Darley*, (3 *Wils.* 6.) because, said Ch. J. *Wilmot*, it must be presumed the testator intended to alter his will; yet, in that case, the testator suffered a recovery, which was absurd and useless, and clearly bad, and without any reasonable meaning to be deduced from it; and Lord *Camden*, on the strength of the opinion of the C. B., held the recovery a revocation of the devise. (See Lord *Loughborough's* remarks on this case, in 2 *Vesey*, jun. 430.)

The opinion of Ch. J. *Trevor*, in *Arthur* v. *Bockenham*, (*Fitzgib.* 240.) is a strong authority on the point, and it is frequently cited as unexceptionably sound. The law, he says, is so very strict, that it requires the interest which the testator had when he made the will, should continue and be the very same interest, and remain unaltered to his death; and the least alteration of that interest is a revocation of the will. He referred to the case in which a tenant in tail, who has an estate of inheritance, as such tenant, and could dispose of the absolute inheritance and fee by fine and recovery, devises the same, and then suffers a recovery to himself and his heirs; this was a revocation, though he was owner when he made the will, and was no more afterwards, but the estate was altered, and he had another sort of fee. He then referred to such a case as that of *Dister* v. *Dister*, where a tenant in fee devises the land, and then makes a feoffment to the use of himself and his heirs. He remained absolute owner as before, and yet the will was held to be revoked by reason of the alteration.

In *Roper* v. *Radcliffe*, (10 *Mod. Rep.* 230.) it was conceded by the counsel and the Court, that a devise to a person disabled by law from taking, was a revocation of a prior devise, on the ground of the intention to revoke. Lord *Hardwicke*, in *Parsons* v. *Freeman*, (3 *Atk.* 748.) recognised the doctrine of the above cases; and held, that if the testator levied a fine, or enfeoffed a stranger to his own use, it was a revocation, though the testator was in of his old use. He admitted, that this was a prodigiously strong instance of the severity of the rule; and Lord *Mansfield* observed, (*Doug.* 722.) that the *Earl of Lincoln's* case, decided on the same principle, was shocking. Still it was admitted to be a rule of law, settled and to be observed. Lord *Hardwicke* went at large into the consideration of the same subject, in *Sparrow* v. *Hardcastle*, (3 *Atk.* 798. 7 *Term Rep.* 416. n. S. C.) and laid down the same rule. The testator, after the devise, conveyed the estate, and took back a declaration of trust,

1823.

WALTON
v.
WALTON.

*If the testator sells the estate devised, though he takes it back by the same instrument or otherwise, it is a revocation of the will, though he did not intend to revoke it. But a mortgage or charge created for the payment of debts, is not a revocation beyond the special purpose of it.*

which afterwards was performed, and ceased, so that he and his heirs were entitled to a reconveyance. Still it was a revocation, for the estate did not continue in the same condition; and any alteration, any new modelling of the estate after the will, was, as he observed, a revocation, except in the cases of mortgages and charges on the estate for debts, which are only a revocation *quoad* the special purpose, and they are taken out of the general rule on the fact of being securities only.

In *Bridges* v. *the Dutchess of Chandos*, (2 *Vesey*, jun. 417.) Lord *Loughborough* ably reviews the cases, and acknowledges the rule which has been stated. But the great case of *Cave* v. *Holford*, (3 *Vesey*, 650. 7 *Term Rep.* 399. 1 *Bos.* and *Pull.* 576. S. C.) led to a thorough examination of all the law on the subject, and was discussed with infinite ability in the several Courts of law and equity; and it was most authoritatively settled, that where a testator, after the will, conveyed the estate to trustees, in trust for himself, in fee, till marriage, and for default of issue of the marriage, to the use of himself in fee, and he married and died without issue, the conveyance was a revocation of the will both in law and equity. The doctrine of the case is, that by a conveyance of the estate devised, the will is revoked, because the estate is altered, though the testator take back the same estate, and by the same instrument, or by a declaration of uses; and though he did not intend to revoke the will. It is revoked upon technical grounds, because the estate has been altered. And Lord *Hardwicke* said, in *Sparrow* v. *Hardcastle*, the rule had been carried so far, that if the testator suffered a recovery for the very purpose of confirming the will, it was still a revocation, for there was not a continuance of the same unaltered interest.

We see, then, that either a change of the estate, or an act, though nugatory in itself, yet demonstrating an intention to revoke the will, will amount to a revocation; and that the exception to the general rule, making an alteration of the

estate a revocation, is the case of a conveyance for the special purpose of payment of debts.

Equity, in the government of trust estates, follows the rules and analogy of law as to real estates ; and legal and equitable estates, as to these implied revocations, stand on the same ground. I do not see how I can avoid considering the will revoked, as to the lot No. 17, for the estate did not continue in the testator. By the contract of sale, he became seized in trust for the purchaser. The revocation may be placed on the ground, either of an intention to revoke by the sale, or of an alteration of the estate by vesting an equitable title in *Baldwin*. The rescinding of the contract was an acquisition of the old use and title by the new agreement ; and this is not a stronger, nor so strong a case, as some of those we have already referred to, and particularly the case of a conveyance by the testator to the use of himself, or upon a consideration which fails, or by a conveyance which is incomplete and invalid, or to a person who is incompetent to take. If the revocation be placed upon the ground of intention or of alteration, the presumption of intention, or the fact of alteration of the estate, is as manifest here as in the other enumerated instances ; and upon principles of equity, the continuance of the estate in the testator did cease by the contract of sale. The contract is to have the same effect in this Court, upon the question of revocation, as a conveyance at law would have had in a Court of law ; and a recovery of the estate, by a surrender of the contract, does not, and cannot restore the will, any more in the one case than a reconveyance in the other. The hard decisions at law, touching these revocations, have been established and adhered to ever since the time of *Edward* III., with unshaken firmness, as necessary to preserve the great landmarks erected for the protection and security of real property. I entirely approve of the observation of Lord *Kenyon*, made in reference to the very doctrine which we have been reviewing, that " it was suffi-

*Equity in the government of trust estates, follows the rules and analogies of law as to real estates.*

*Where a contract made by a testator, for the sale of land devised by him, is afterwards absolutely rescinded, by the mutual consent of the purchaser and testator, who is thus restored to his former title, and dies seised of the land, the devise is, nevertheless, revoked and gone forever.*

cient, in answer to objections to established rules of law of this kind, to say, *ita lex scripta est ;* and that it was his duty as well as his inclination, to follow and give effect to the series of decisions of great and learned men on the rules of law."

I shall accordingly decree, that the defendant give the requisite authority to the plaintiff to receive, on his own account, and for his own use, the dividends due and unpaid, or which may hereafter be declared, on the interest of the testator in the bank shares ; and that the defendant assign over to the plaintiff, for his own use, the two shares in the *Northern Navigation Company,* and account and pay to the plaintiff the 327 dollars and 27 cents, received on the shares in the *Western Navigation Company,* together with interest thereon, and that the costs of this suit be paid by the defendant out of the funds belonging to the residuary legatees, inasmuch as the suit was rendered necessary by the acts of the defendant, as one of the residuary legatees, and by the dispositions of the will.   The cases in 9 *Vesey,* 180. and 4 *Johns. Ch. Rep.* 608. are authorities for this direction as to costs.   And I shall declare, that the will was revoked, as to the lands which the four several contracts set forth in the answer covered, and as to the lot No. 17, mentioned in the pleadings.

Decree accordingly.