In the Matter of the Judicial Settlement of the Account of Proceedings of CITY BANK FARMERS TRUST COMPANY (Formerly Known as THE FARMERS' LOAN AND TRUST COMPANY), as Executor of the Last Will and Testament of SETH Low, Deceased, and as Trustee of the Trusts Created under the " Seventeenth," " Eighteenth," and " Nineteenth " Clauses of Said Will, and of CITY BANK FARMERS TRUST COMPANY, as Executor of the Last Will and Testament of ANNIE W. S. Low, Deceased, of Her Proceedings as Executrix of the Last Will and Testament of SETH Low, Deceased, and as Trustee of the Trusts Created by the " Seventeenth," " Eighteenth " and " Nineteenth " Clauses of the Will of SETH Low, Deceased.

WILLIAM RAYMOND and Others, Appellants; ROBERT L. PIERREPONT and Others, Respondents.*

Second Department, May 15, 1931.

* Revg. 136 Misc. 532.

*C. Alexander Capron* [*David Kelly* with him on the brief], for the appellants Marian Low Raymond and others.

*William M. Patterson* [*John Ewen* with him on the brief], for the appellant Charles A. Frank.

*Francis Smyth,* for the respondents The Rector, Church Wardens and Vestrymen of St. George's Protestant Episcopal Church.

*Francis L. Durk* [*Jackson A. Dykman* and *Ralph W. Crolly* with him on the brief], for the respondents Robert L. Pierrepont and others.

YOUNG, J. The proceeding is for an accounting by the executor and trustee under the will. In its petition the executor alleged that a question had arisen concerning the true meaning and construction of the 17th clause of the will and asks that it be construed:

Seth Low died on September 17, 1916, leaving a will bearing date April 28, 1916, which was admitted to probate on October 6, 1916, and letters testamentary issued to Annie W. S. Low, his widow, and the petitioner. By the 1st and 7th clauses of his will he created two trusts, one for $15,000, the income of which was to be paid to his cousin, Ellen Almira Dow, for her life. The other was for $12,000, the income of which was to be paid to Annie Hughes, the daughter of the decedent's old nurse, for her life. Upon the death of these two beneficiaries, the principal sums were to fall in the residuary estate. After providing for various legacies, the will, by the 17th clause, provided as follows:

" *Seventeenth.* I give and bequeath to my executrix and executor, hereinafter named, the sum of Four hundred thousand Dollars, in cash or in the securities in which my personal estate may be invested at the time of my death, as my executrix and executor may determine under the discretionary power hereinafter conferred upon them, in trust to hold the same and to pay the income arising therefrom, as the same shall accrue to my wife, Annie W. S. Low, during her life; upon her death (whether before or after mine), in order that they may deal more easily with the problems which they have inherited, I give and bequeath, out of the said principal sum, Eighty thousand Dollars to my sister-in-law, Marian Ward Low, wife of my late brother, Abbot Augustus Low, or, if she shall have died, to their descendants, in equal shares, *per stirpes* and not *per capita*; and I give and bequeath out of said principal sum, Eighty thousand Dollars to each of the children of said Abbot Augustus Low and Marian Ward Low, viz: Marian Low Raymond, George Cabot Ward Low, Abbot Augustus Low, and Seth

Low; if any of said children shall have died, leaving descendants, I give and bequeath said sum of Eighty thousand Dollars which he or she would have received, to such descendants, in equal shares, *per stirpes* and not *per capita;* if any of said children shall have died, leaving no descendants, I give and bequeath said sum of Eighty thousand Dollars which he or she would have received, to the other children who may then be living and the descendants of those who may then be dead, in equal shares, *per stirpes* and not *per capita.*"

By the 18th clause he bequeathed to his wife, Annie W. S. Low, $100,000 absolutely, and further provided as follows: " All the rest, residue and remainder of my estate, both real and personal, and wheresoever situate, I give, devise and bequeath to my executrix and executor, hereinafter named, in trust to hold and invest the same and to pay the income arising therefrom, as the same shall accrue, to my wife, Annie W. S. Low, during her life. This provision for my wife shall be in lieu of all dower."

Then follows a provision that, until regular payments of income under the 18th clause of the will are established, the sum of $25,000 per annum should be paid to his wife. Provision was also made by the same clause that his widow should be permitted to occupy Broad Brook Farm free of rent, but subject to payment of taxes and expenses of maintenance and operation.

The 19th clause of the will provides in substance that, subject to the life estate of his wife, and upon her death, the executor and trustee should divide the money and personal property, exclusive of the two trusts created for the benefit of Ellen Almira Dow and Annie Hughes, respectively, and the proceeds of the sale of his real estate from time to time when available in convenient amounts, into 200 shares as nearly equal as possible. Fifty of these parts are bequeathed to the same legatees as those mentioned in the 17th clause of the will; 50 to the children of the decedent's late sister, Ellen L. Pierrepont; 50 to the children of his stepbrother, William G. Low, and the remainder of these 200 shares to various legatees. By paragraph 12 of this 19th clause the will provides in substance that, until Broad Brook Farm was sold or disposed of, the executor should pay over semi-annually to certain of the individual legatees " interest at the rate of four per centum per annum upon their respective bequests or any unpaid balance thereof, computing each part bequeathed at $2,000," etc.

The testator was a man of eminence, having been mayor of New York city and president of Columbia University. His widow survived him, but died on April 1, 1929, and the trust created for her benefit by the 17th clause of the will, above quoted, termi-

nated. On December 28, 1928, Marian Ward Low, one of the remaindermen named in the 17th clause, died, leaving her surviving her four children above named, who also survived the widow.

The trust fund of $400,000 created by the 17th clause increased substantially in value, so that at the time of the accounting of the trustees, after deducting the expenses of administration and commissions of the trustee, it amounted to $554,204.68, being $154,204.68 in excess of the $400,000 bequeathed by the testator. There was also an increase in the value of the residuary estate to the extent of $133,425.71.

The question presented is whether the increase of the trust fund created by the 17th clause of the will is distributable in equal shares among the children of the testator's brother, Abbot Augustus Low, legatees and remaindermen named in that clause, or whether they are each entitled to the sum of $100,000 only, and the residue distributable among the residuary legatees under the 19th clause of the will. The surrogate construed the will as meaning that each of the four children of the testator's brother named in the 17th clause were entitled to the sum of $100,000 and no more; that Marian Ward Low, having died before Annie W. S. Low, her interest passed under the 17th clause to her children, increasing their legacies from $80,000 to $100,000 each, and that the excess of this trust fund over the sum of $400,000 became part of the decedent's residuary estate. A decree was entered pursuant to this decision and the remaindermen legatees under the 17th clause of the will and those claiming under them have appealed from the portion of the decree which so construes that clause. The surrogate held in substance that, by this clause, " the testator created a demonstrative legacy — so that in case of wastage the slack could be picked up from the general assets and the gift at the death of his wife be made definite and certain, with the legal consequence that the accretions would fall into the residuary estate."

The intention of the testator, if ascertainable from the will, is controlling. (*Matter of Rooker,* 248 N. Y. 361.) We must, therefore, consider the general scheme disclosed by this will. At the time of its execution, and probably also at the time of the testator's death about five months later, he apparently estimated the value of his estate at approximately $1,000,000. Roughly speaking, the will gave approximately $100,000 in general and specific legacies, $100,000 was bequeathed absolutely to his wife, $400,000 in trust for her benefit by the 17th clause in question, and approximately $400,000 by the residuary clause upon a like trust. It is manifest that, aside from his widow, the appellants (the remaindermen

described in the 17th clause) were the chief objects of the testator's bounty, since in addition to the vested remainders under that clause they took one-fourth of the residuary estate.

To hold that these bequests are demonstrative legacies seems to me to be contrary to the general scheme of the will. In other words, had the testator designed that any shrinkage in this $400,000 trust fund should be made up from the residuary estate, so that each of these legatees should receive exactly $80,000, two trust funds for the same life beneficiary were unnecessary. The same purpose could have been accomplished by combining them. The appellants contend that the testator's purpose in separating these trusts was that he desired to give the widow and children of his deceased brother, immediately upon his death, the principal of the trust fund of $400,000, subject only to the equitable life interest of the widow, and that this separation of the two trusts constitutes the only appropriate method to carry that purpose into effect. There seems to be some force in this contention.

The surrogate, in his opinion, said that a study of the will revealed that the testator intended the gift of $80,000 to be definite and certain; that he knew the uncertainty in the amount of a residuary estate, particularly after a lapse of years, and that, if such residuary estate shrank to a small amount, the will made unfailing gifts of sums of money to these legatees, so that, in the language of the 17th clause, " they may deal more easily with the problems which they have inherited." He further said that there was nothing to indicate that in 1916 Seth Low anticipated there would be a large appreciation in his securities. On the other hand, there is nothing to indicate that he contemplated a shrinkage, which he intended should be made up from his residuary estate. Although at the present time the value of this trust fund, as expressed in dollars, has increased, it is not greater in purchasing power than the sums contemplated by the testator that these legatees should receive under his will.

In my opinion, to call these legacies demonstrative legacies is to give a forced construction unwarranted by the language used. Stripped of its verbiage, this 17th clause gives $400,000 to the executors in trust to pay the income to the testator's wife for life, and, upon her death, it provides, " I give and bequeath, *out of the said principal sum*, Eighty thousand Dollars " to each of the legatees named. The mere fact that this share of this trust fund is expressed in dollars rather than in fractional parts does not indicate that the testator intended to give this exact sum of $80,000 and no more; nor, in my opinion, does it make it a demonstrative legacy. Had this clause of the will provided, " I give and bequeath

out of the said principal sum one-fifth thereof " to each of the legatees named, I do not think it would have changed in any respect the meaning of the language used. If that language makes these legacies demonstrative, the substitution of fractional parts for dollars would not change that result. They would still be demonstrative legacies. We must consider something more than the expression in this will of an exact amount of dollars. The testator, by this clause, devoted $400,000 to this trust if his wife survived him. If she did not survive him, it was his plain intention that this fund should be equally divided between the legatees named. It is difficult to believe that he intended, in the event that his wife survived him for a number of years, that this trust fund should not be so equally divided between the legatees named, but that they should be limited to the exact sum of $80,000 each. I can see no reason for any such difference in intention and nothing in the will discloses it. In my opinion, he intended that the principal of this fund, upon his wife's death, should be equally divided among these legatees, and these legacies are not demonstrative legacies.

A demonstrative legacy is a creation of the civil law. In substance, it is a legacy general in form, but pointing out a particular fund from which it shall be paid. It possesses some of the attributes of a specific legacy, and also of a general legacy. Unlike a specific legacy, however, if, at the time of the testator's death, the fund from which it is directed to be paid is insufficient or no longer exists, it does not abate but must be paid in full from the general assets of the estate. (*Walton* v. *Walton*, 7 Johns. Ch. 258, 262; *Crawford* v. *McCarthy*, 159 N. Y. 514, 519.) The case at bar seems to be the first wherein this doctrine is invoked, not to make up from the general assets of the estate the full amount of these legacies because of the failure or decrease of the fund, but to prevent the legatees from receiving the increase in that fund.

If these legacies given by the 17th clause of this will to the remaindermen named constitute demonstrative legacies, any will which creates several trusts for different groups of legatees (aside from the residuary estate) would be susceptible of a similar construction.

The only case which seems to have any analogy to the case at bar is one decided by the English Court of Chancery (*Matter of Cruddas*, [1900] 1 Ch. 730). In that case George Cruddas gave to his trustees £30,000 in trust to invest and pay the income to his daughter during her life and gave his daughter power to appoint the principal at her death. In her will the daughter referred to this trust fund over which she had power of appointment and

provided that, after her death, the trustees of her father's will should stand possessed thereof upon certain trusts which she expressed as follows: " ' * * * that is to say, as to the sum of 1000*l*. part thereof in trust for my daughter Emmeline Smith absolutely. * * * And as to another sum of 1000*l*. (other part of the said sum of 30,000*l*.)' upon similar trusts in favor of the testatrix's daughter Ada Smith and her children. ' And as to the sum of 4000*l*. (other part of the said sum of 30,000*l*.)' upon trusts for the benefit of George Cruddas Smith, a son of the testatrix, and his children."

Then follow bequests in similar language of three sums of £6,000 each to her three sons, the final £6,000 being disposed of as follows: " ' And as to another sum of 6000*l*. (being the remainder of the said sum of 30,000*l*.)' upon similar trusts in favor of Albert Smith, another son of the testatrix, and his children."

At the time of the daughter's death the fund was of the value of £39,000, and the question presented was whether the testatrix had appointed the full £39,000 or only £30,000.

The court held that the testatrix had intended to bequeath the full principal of the trust to her children in the proportions which the specific sums mentioned bore to the £30,000, the master of the rolls, after referring to the provisions of the daughter's will, saying: " What does the testatrix mean by that? She is dealing with an invested fund of 30,000*l*., and in my opinion each appointment which she makes of a specified sum is an appointment of that sum as an invested fund * * * of 1000*l*.— a sum of 1000*l*. as it is invested. It happens that the 1000*l*. as invested is now worth more than 1000*l*. Then when she appoints the last sum of 6000*l*. she describes it as ' the remainder of the said sum of 30,000*l*.' It is plain to my mind that she was dealing with the 30,000*l*. as an invested fund, and that she did not intend to leave any part of it unappointed. The appeal must be allowed, and it must be declared that the appointees take the invested fund in the proportions indicated by the testatrix."

I can see no distinction in principle between the two cases. In the case at bar, as in the *Cruddas* case, the testator was dealing with an invested fund, and did not intend to leave any portion of it unbequeathed by the 17th clause, but did intend that these legacies should exhaust the fund. Indeed, I think the case at bar is much stronger than the *Cruddas* case because each of the legacies here is exactly one-fifth of the $400,000 fund, while in the *Cruddas* case they were of varying amounts. Nor do I think there is any distinction in principle between the language used in the Cruddas will appointing a certain amount of pounds " *part of* " the fund

in question, and the bequests made in the will in the case at bar of $80,000 " *out of* " said principal sum. In both cases the testator was dealing with an invested fund. Each of these $80,000 legacies in remainder became, upon the testator's death and the setting up of the trust, a part of that invested fund, and by each of these bequests the testator means " an invested fund of " $80,000.

The respondents urge that because the testator was a man of learning, accustomed to the management and disposition of property, president of Columbia University, mayor of New York, and knew the meaning of words and the effect of their association in sentences, he, therefore, provided a demonstrative legacy for each of these remaindermen. This by no means necessarily follows. Although a man of great mentality, the testator was not a lawyer, and to suppose that he ever had a thought in his mind of creating a demonstrative legacy would, in my opinion, ascribe to him an unusual technical knowledge of the law. A demonstrative legacy is a mere creation or fiction of law, intended to cover a situation arising from some uncertainty or ambiguity in the language of a will, where the real intent of the testator is not apparent. I venture to say that no attorney, much less a layman, would ever intentionally attempt to create a demonstrative legacy by language so uncertain as to require judicial construction. Had the testator or his draftsman actually intended any such result, he would have expressed that intention in no uncertain language.

The decree of the Surrogate's Court of Westchester county, in so far as appealed from, should be reversed upon the law, with costs, payable out of the estate, to each party appearing and filing a brief, and matter remitted to the surrogate for the entry of a decree construing the 17th clause of the testator's will as bequeathing to the four children of Abbot Augustus Low, in equal shares, the whole principal sum of the trust fund created by the 17th clause of the will and directing distribution thereof accordingly.

LAZANSKY, P. J., and CARSWELL, J., concur; HAGARTY, J., dissents; TOMPKINS, J., not voting.

Decree of the Surrogate's Court of Westchester county, in so far as appealed from, reversed upon the law, with costs, payable out of the estate, to each party appearing and filing a brief, and matter remitted to the surrogate for the entry of a decree construing the 17th clause of the testator's will as bequeathing to the four children of Abbot Augustus Low, in equal shares, the whole principal sum of the trust fund created by the 17th clause of the will and directing distribution thereof accordingly.