(Decided March 3rd, 1898).

---

## ANN MONTGOMERY SLINGLUFF et al *vs.* JAMES CARROLL JOHNS et al.

*Construction of a Will—Substitution of Words in Order to Carry Out the Intention of Testator.*

A testator devised certain property to trustees for the benefit of his two daughters, "and for their children if they marry and have descendants. If they should not marry, or marry and die without child or children, my will is that this portion of my estate * * should at their death revert to my children who may survive or to the descendants of their children and be equally divided between them." Both of the testator's daughters died without issue, leaving surviving them three brothers and the children of a brother who had predeceased them. *Held,* that the children of the latter were entitled to share equally *per stirpes* in the property left in trust, with the three brothers who were living at the time of the death of the daughters, because it appears from the whole will that the intention of the testator was to divide his estate equally among all his children.

When necessary to carry out the manifest intention of the testator, a direction in a will that upon certain contingencies property shall be divided between "*their* children" will be changed so as to read "*my* children," and the word *or* changed so as to read *and.*

Where a testator gives property to his daughter A. for life, followed by a direction that upon her death without issue the property shall be divided among the testator's surviving children, then the period of survivorship is to be referred to the death of the life-tenant.

Appeal from a decree of the Circuit Court of Baltimore City (DENNIS, J).

The cause was argued before McSHERRY C. J., BRYAN, FOWLER, BRISCOE, PAGE, ROBERTS, BOYD and PEARCE, JJ. (Feb. 8, 1898).

*Fielder C. Slingluff* and *Samuel D. Schmucker*, for the appellants.

*J. Wilson Leakin*, for James Carroll Johns, appellee.

*W. George Weld* (with whom were *Wm. F. Porter* and *Wm. Cabell Bruce* on the brief), for W. F. Porter and wife, appellees.

*Charles G. Kerr* and *Oswald Tilghman*, filed a brief for John K. Johns and wife, appellees.

PEARCE, J., delivered the opinion of the Court.

This suit was instituted to procure a construction of the following clause in the will of the late Rev Dr. Henry V. D. Johns :

" Aware of the liability to loss of their patrimonial estates by females through injudicious marriages or mismanagement, I hereby appoint my two eldest sons, to act as trustees of that portion of my estate which I have devised to my two daughters. This property I hereby entrust to my two eldest sons   *   *   *   to be sacredly kept and safely invested, for the sole and exclusive use of my two daughters, Fidelia and Lavinia, and for their children, if they marry, and have descendants. If they should not marry, or marry and die without child or children, my will is that this portion of my estate hereby entrusted to my sons, for the benefit of their sisters, should at their death, revert to my children who may survive, or to the descendants of their children, and be equally divided between them." The testator died in 1859, leaving six children surviving him, namely, Dr.

Montgomery Johns, Henry V. D. Johns, James Carroll Johns and Dr. John Kensey Johns ; and two daughters, Fidelia R. Johns and Lavinia M. Johns.   Dr. Montgomery Johns died in 1871, leaving children still surviving ; Fidelia married and died many years ago, leaving no issue, and Lavinia died in October, 1896, unmarried and without issue. Henry, James and John were all living at Lavinia's death, and the question is, whether Lavinia's share now goes exclusively to the three children of testator surviving at her death, or whether the children of Montgomery, the deceased son, take what would have been his share, had he survived Lavinia.   The Circuit Court of Baltimore City held that the children of Montgomery are not entitled to take his share, and from that decision this appeal is taken.

In reaching this conclusion, exclusive controlling effect was given by the Circuit Court to two well-established general rules of construction : First, that where a life-estate is created, and a gift is made over to survivors, the period of survivorship must be referred to the death of the life-tenant—or first legatee—and not of the testator ; and second, that where words are used in themselves meaningless, and which cannot be corrected by alteration, addition or transposition, upon any sound principle of construction, they shall be altogether rejected.   Applying these rules, it was concluded : First, that the words " to my children who may survive " if they stood alone, would clearly mean only those who survived Lavinia ; and second, that the succeeding words, " or to the descendants of their children to be equally divided between them," are meaningless, without taking undue liberties by way of alteration, and therefore cannot qualify the preceding words, but must be rejected in construing the will, and for this reason the children of Montgomery must be excluded from the bounty of the testator.   It is too clear for controversy under the decision in *Reiff* v. *Strite*, 54 Md. 303, and other Maryland cases, that in the absence of the words " or to the descendants of their children, &c."—or of any other qualifying words,

that only those children of the testator could take, who survived Lavinia, and it therefore only remains for us to determine whether this will is to be controlled by the second rule applied by the Circuit Court in deciding the case, and we have given to this question that full and careful consideration which is due not only to the interest of those concerned, but to the recognized learning and ability of the Judge, from whose decision this appeal is taken.   The construction of every will must be determined upon its own peculiar circumstances as they appear in the will itself, and therefore it is, that the mere fact that similar language has been elsewhere construed and interpreted in the light of facts there disclosed, cannot be accepted as necessarily controlling in other cases.   The maxim that " the intention of the testator, when apparent on the face of the will, must be gratified, if it be lawful to do so," must always be invoked, when any particular clause of the will is obscurely or inaptly expressed, though when so invoked, great care is required that the privilege of construing the will, be not perverted into the privilege of reconstructing it.   In *Larmour* v. *Rich*, 71 Md. 369, this Court expressed with much force and clearness the manner and spirit in which this duty of construing a written instrument should be approached, saying, " obviously, the most simple and natural way to ascertain what a testator's or grantor's intention was, is to read what he has written, because what he has written, was designed by him to express that intention.   It is true there are many other rules of construction to which resort is sometimes had * * *.   Generally speaking they are not suffered to defeat a clearly manifested intention * * *.   If we lay aside, and put out of view, for a moment, these artificial rules, and read the language of the deed and will, as it would strike the mind of one unacquainted with such rules, there will be little, if any, difficulty in discovering with reasonable certainty, what the testator, or grantor, actually intended to do.   This is permissible because we are seeking

to discover what he meant, and we must therefore put ourselves as nearly as possible in his place."

In *Commercial Building Association* v. *Mackenzie*, 85 Md. 136, the Court said : " When a written instrument of whatever character is brought before a Court for adjudication, · the first inquiry must be directed to its meaning. · *Until this is ascertained every step in the proceeding, must be futile and useless * * *.* No general rules have been devised, which are adapted to all cases, and it is not possible, in the nature of things, that any can be devised. Courts must ascertain the meaning of written instruments when it is possible for them to do so, seeking the aid of all rational methods of interpretation." These utterances may be properly repeated and emphasized here, as announcing the primary rule in construing written instruments ; and it must be borne in mind in this connection, that " the predominant idea of the testator's mind when discovered, is to be heeded, as against all doubtful and conflicting provisions, which might of themselves defeat it ; and that the general intent, and the particular intent being inconsistent, the latter must be sacrificed to the former." *Schouler on Wills*, sec. 476.

We think it is manifest, from an analysis of the will of Rev. Dr. Johns, that the predominant idea of the testator was equality of bounty to all his family, and that while he selected and designated the particular property each member of the family would receive, the scheme of his will was practically to dispose of his estate, as the law would have done if he had died intestate. There are numerous indications, we think, of this purpose.

*First.* While disposing of a very considerable estate, ample to have warranted an absolute devise or bequest to his wife, suitable to her needs and social station, had he deemed this the proper mode of provision, he gives her absolutely, only his dwelling, horses and carriage, all of which were specially appropriate for her personal use and comfort ; and then gives her for life only, one-third of the net income of his

real and personal estate, however devised or bequeathed to his children.

*Second.* The library, which is so usually left intact to such one or more of the children, as may be best qualified for its enjoyment, is bequeathed among all his children, after their mother had selected what she wished.

*Third.* The devises to his two sons, John and Henry, being, as he states, disproportioned to the devises to Montgomery and James, he therefore required John and Henry to pay to Montgomery and James $2,000 to equalize them.

*Fourth.* In his codicil, having concluded that he had overvalued the lands devised to John and Henry, and had undervalued those devised to Montgomery and James, he revoked the above legacy of $2,000 because, as he said, he was desirous of doing impartially by all his children.

*Fifth.* Both in the will and codicil, he gave to his executors full discretionary power to sell and reinvest " all such stocks, ground-rents, &c., as may need such change, with a view to equalize the apportionments and to make just and fair portions to each of my children."

*Finally.* Fearing the loss by his daughters of their patrimonial estates, he made the provision we are now considering, and it seems to be plain that in this, he had a two-fold purpose, viz., first, to prevent the wasting of their estates by their husbands if they should marry, and the consequent disherison of *their issue ;* and second, in the absence of such *issue of theirs*, to prevent the diversion of their estates from his own family.   We think he intended these portions of his estate, in any event, to go to *his descendants*, preferably, to *such of his descendants* as traced title through his daughters, in order to preserve that absolute equality of bounty, which we have found to be the predominant idea of his will, and in the absence of issue of these daughters, then *to his other descendants*, no matter what degree should represent these descendants at the daughter's death.  Though the word *family* is not used in this will as in *Taylor* v. *Watson*, 35 Md. 534, yet the idea of the family, we think,

pervades and permeates the four corners of the will. Here, as there, he had no idea of distinguishing between his sons living at the death of Fidelia and Lavinia, and the issue of his sons then deceased, all of whom were equally dear to him, and equally objects of his bounty, " which he designed should flow in the broadest stream among his descendants." Under the rule applied in the Court below, if Montgomery, Henry and James had all died before either Fidelia or Lavinia, each leaving issue, and John alone had survived Fidelia and Lavinia, but without issue, the whole estate of Lavinia, and the half of Fidelia's estate, would have gone to John, and would have been subjected to such alienation by deed or will as he might choose, to the exclusion of every other descendant of the testator. Is it rational to conclude, in view of the general intent which we have found, that he designed such a result as this? And if not, could that result be properly allowed, by segregating, in the construction of this will, the first clause we are considering, and by rejecting altogether the second clause, instead of giving effect to the general intent, by alteration of this second clause, not by indulging in imagination or conjecture, but as the result of a thorough and rational analysis of the whole will, thus avoiding the defeat of the predominant idea of the will, through the rigid application of a rule of last resort to a single doubtful clause. The learned Judge who decided this case in the Circuit Court, held that a construction to admit the children of Montgomery Johns to a share of this fund, could not be made without doing great violence to the language of the will, and that no such plain, unequivocal, and overruling intent of the testator, appeared as would warrant the change of language necessary to this end, and that the intent suggested, in fact rested upon nothing, except the general idea (altogether apart from the words of the will), that a testator would naturally desire the descendants of a deceased child to take the share of their parent. We have said, however, that in our opinion, there does appear from the whole scheme of the will, and from its very words,

a predominant intent to establish absolute equality of distribution among the testator's descendants. And this conclusion is reached by applying the principle so clearly and happily expressed in *Rhodes* v. *Rhodes,* 7 Appeal Cases, 206, where the words of a clause creating certain interests, literally taken, expressed an intention to postpone vesting until after the death of Mrs. Rhodes, while other parts of the will seemed to indicate an intention that they should vest immediately on the testator's death. LORD BLACKBURN saying : " It seems impossible to answer this question without examining the whole will at perhaps tedious length, for every indication of intention that those interests should vest, adds greatly to those that go before or come after. The force of the whole of such indications, taken together, is far greater than the sum of the forces of each, taken separately."

We shall now endeavor to show, that as great, if not greater violence is done to the language of this will, by the rejection of the clause under consideration, as will be done by so altering its language, as to carry out what we have said is the predominant idea of the testator. All that is necessary for this purpose is that the word " or " be construed "and," and the word "their" be changed into " my." The construing of " or " as " and," and the converse, both in wills and deeds, is freely admitted by Courts, whenever it is held to be unequivocally clear that the true general intent will thereby be given effect, and if we are correct in our analysis of this will, the change of " or " into " and " becomes an imperative duty. To change the word "*their*" into "*my*," is, however, a stronger measure, a higher exercise of judicial authority, and can only be justified by a clear explanatory context, as we think is here found. "Wherever it is apparent not only that the testator has used the wrong word, but also what is the right one, the alteration is warranted by the established rules of construction." 1st *Jarman on Wills,* 6th ed. 504, and this author cites the case of *Doe* v. *Gallini,* 5th B. & Ad. 621, in which the

word " *all* " was changed into " *any*," and the words " with-
out issue," were read " leaving issue," in order to render
the language of the will sensible and consistent with the
context.    In *Keith* v. *Perry*, 1 Desaus, 353, there was a
bequest to a daughter Mary, for life, and at her death, to
the heirs of her body, and to their heirs forever ; there was
also a bequest to another daughter Susanna, for life, and at
her death, to the heirs of her body, and to *her* heirs or
assigns forever, and the able Chancery Court of South
Carolina determined that the last *her* should be construed
" their. "    In *Commercial Association* v. *Mackenzie, supra*,
the Court has collected a number of cases, showing " how
readily the Courts will brush aside the language of an instru-
ment when it stands in the way of its meaning."    The prin-
ciple on which all these cases are placed, is " that the Court
is bound to ascertain, whenever it is possible, the true mean-
ing of the paper, even in direct opposition to the terms em-
ployed."    In the recent case of *Ruckle* v. *Grafflin*, in this
Court, 86 Md. 627, the question was whether land passed
under the residuary clause of the will, being designated
therein merely by the word " effects," and it was held that
the inquiry was not into the accurate or technical meaning
of the word, but into the intention which the testator had in
using it, and that as the testatrix had by previous clauses
disposed of both real and personal estate, and in the resid-
uary clause had disposed of " all the remainder of my
effects," it was clear that she used the word " effects " in-
discriminately for real and personal estate, and for this reason
the land passed.    In the present case, if the testator had
stopped with the words " my children who may survive," it
would have been clear, conceding as we do, that the surviv-
orship is referable to the death of Lavinia, that the children
of Montgomery could not take any part of Lavinia's share ;
but he did not stop here ; he added (construing " or "
" and "), " and the descendants of *their* children, to be
equally divided between them."    This whole clause cannot
be a clerical error, an insertion by the draftsman without

the direction or sanction of the testator. It was designed to mean something, and however obscure by itself, or inaptly expressed, it undeniably declares an intention, that the estate in question should not go exclusively to the children of the testator who survived his daughters. Taken literally, it would admit to participation with a surviving child, the grand-children of a deceased child, but would exclude the children of another deceased child. Can any natural ground be assigned for such admission, and such exclusion, in one breath, and can it be reconciled by any ingenuity, with the other provisions of this otherwise just, consistent and harmonious instrument ? The astute counsel of the appellees evidently felt the necessity of diverting attention from this difficulty, when they suggested that " descendants of their children " meant descendants of Fidelia's and Lavinia's children—but this would defeat the interest of Fidelia and Lavinia's children, if they had left both children and grand-children and would thus contravene the clear intent that their children should take, " if they should marry and have descendants." This construction also wholly ignores the significant use of the word *revert*, which indicates that the estate was to go *back from* Fidelia to collaterals, and not *down* in the direct line to their descendants in any degree, the whole contingency there contemplated, being total failure of issue of Fidelia and Lavinia. If then it cannot mean, for the reasons we have stated (reasons which the Circuit Court found sufficiently strong to warrant the rejection of the whole clause), the grand-child of a deceased child of testator—nor the grand-children of Fidelia and Lavinia—whose descendants can it mean but those of his own deceased children ? To reject these words altogether, is certainly to do violence to the language of the will, and defeats what we regard as the manifest general intent of the testator, while the alterations proposed do less violence to the language and are made in accordance with the intent we have found to be reasonably apparent. In the case of *Turner* v. *Withers*, 23 Md.

40, relied on by the appellees as decisive of this case, there were no qualifying words as in this case.   So with the case of *Hill* v. *Rockingham Bank*, 45 N. H. 273, also relied on, in which the Court said:  " This we think is the rule when the bequest is in these terms, and nothing more, subject of course to be controlled by a manifestation in the will of a different intention."   And in *Demill* v. *Reid*, 71 Md. 192,. JUDGE MILLER cited the New Hampshire case above, emphasizing the qualification equally with the rule.

Having construed " or " as " and," the devise cannot be substitutional, in the sense held by the Circuit Court, viz. , that the descendants of the testator's grand-children are substituted only upon failure of all testator's children—and when " their " is changed into " my," upon the views and authorities we have stated, all difficulty as to whether the distribution is to be *per stirpes* or *per capita*, vanishes, since it is then plain that the descendants of testator's children represent the deceased parent, and necessarily take *per stirpes* (or by representation).   They take, under the altered. language of the will, by virtue of the *reverting* directed by the testator to his children then surviving, and to the descendants of his (my) children ; and the words, " to be equally divided among them," being properly referred to this reverting, imply an equal division, not between the *individuals* who take, but between the respective *stocks* that take, viz., the surviving children, and the deceased children. In *Jarman on Wills*, page 1051, it is said that generally where a devise or bequest is made to a person and the children of another person, they take *per capita*, and not *per stirpes ;* but that this mode of construction will yield to a very faint glimpse of a different intention in the context, and he cites in support of this text, *Alder* v. *Beall*, 11 G & J. 123, which fully sustains him, as does the later case of *Levering* v. *Levering*, 14 Md. 38.   The statement of Jarman is also recognized in *Brittain* v. *Carson*, 46 Md. 186, though the general rule was there applied, only because

there was nothing in that will to show that the grand-children were to take by representation.

It follows from what we have said that the decree must be reversed and the cause remanded for the purpose of having the principles of this opinion carried into effect.

> *Decree reversed and cause remanded,*
> *the costs above and below to be*
> *paid out of the estate.*

(Decided March 3rd, 1898).