STINCHCOMB, ET AL., Executors u/w of Lillian Anita Staub *v.* MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY, Substituted Trustee u/w of Frederick Schoenherr, ET AL.

[No. 226, September Term, 1969.]

*Decided April 3, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Charles J. Stinchcomb,* with whom were *Leslie J. Polt* and *Weinberg & Green* on the brief, for appellants.

*William L. Marbury,* with whom was *Jesse Slingluff* on the brief, for appellee Fidelity Union Trust Co., Executor u/w Robert Wilson, and *Daniel H. Honemann* for appellee Edward H. Hehrlein, with whom were *Richard K. White, Jr.,* on the brief, for appellee Mrs. Pattie Tenney Kelly, Executrix u/w James Bright Kelly, and *W. Hamilton Whiteford* on the brief, for appellee Norman R. Freeman, Jr., Executor u/w Norman R. Freeman.

FINAN, J., delivered the opinion of the Court.

In writing this opinion we find sustenance in the aphorism that, "No will has a twin brother," [1] and hence the improbability that we shall soon again encounter a testamentary document of similar import.

Mercantile-Safe Deposit and Trust Company (Mercantile), one of the appellees, as Substituted Trustee under the will of Frederick Schoenherr, deceased, filed a bill of complaint in the Circuit Court of Baltimore City for the construction of his will. This required the joining as defendants the remaindermen of the trust created by

---

1. McNamara, "Famous Legal Quotations," pg. 562.

items second through eleventh of the will. Among the defendants were the executors of four estates, including the appellants as executors of the estate of the testator's widow, Lillian Anita Staub, formerly Lillian Anita Schoenherr, and also unknown persons who might have an interest in the trust under the will.

The remaindermen (appellees) contended that the remainders were vested in them and that the remainders included all of the corpus of the trusts including the appreciation in the corpus. The executors of the residuary legatee, the widow, who was also the life tenant, contended that, reading the will as a whole it should be construed to mean: (1) that the remainders were vested but subject to be divested by the death of a named remainderman prior to the death of the life tenant, and (2) that the appreciation in the principal of the trust following the sale of the stocks, which constituted the original principal, was not disposed of by the remainderman provisions of the trusts but fell into the residue of the estate and passed under the residuary clause of the will to the widow.

The testator, Frederick Schoenherr, died childless in the City of Baltimore on September 3, 1924, survived by his widow, Lillian Anita Schoenherr, who, as we have already indicated, subsequently married Mr. Staub. The testator had no brothers and only one sister, Mrs. Selma J. Wolff, one of the contingent remaindermen under item tenth of the will. Mr. Schoenherr's will was dated March 18, 1924, and it is uncontradicted that at the time of its execution he was aware that he was suffering from a fatal illness. The will was drawn in New Jersey by a member of the bar of that state.

At the time of Mr. Schoenherr's death the principal assets of his estate consisted of shares of stock in two corporations in which he was the majority stockholder, The Interstate Shade Cloth Company (Interstate) and The Lapsley-Interstate Shade Cloth Company (Lapsley). He owned 1,512 shares of Interstate stock, valued in the inventory of his estate at $109.00 per share or a total of

$164,808.00; he owned 4,170 shares of Lapsley stock, valued in the inventory of his estate at $39.00 per share or a total of $162,630.00, making the total appraised value of the Lapsley and Interstate stock of $327,438.00.

The testimony reveals that the testator and Mr. Robert Wilson had been intimate friends since their early boyhood in Hoboken, New Jersey. During the year 1914, the testator, who had already made a successful start in business in Baltimore, backed Mr. Wilson in a similar venture in New Jersey. In 1918 the testator and Mr. Hehrlein became acquainted while in military service, and the latter went to work for the testator during that year. It is apparent that all three of these gentlemen were fortunate in enjoying a most amicable and prosperous business association. Mr. Norman J. Freeman and Mr. James Bright Kelly, also objects of the testator's bounty, were employees of the corporations for many years and each was referred to in the will as "my friend." It is against such a background that the actions of the testator in making his will must be viewed. *Hebden v. Keim,* 196 Md. 45, 48, 50, 75 A. 2d 126 (1950), and *Slingluff v. Johns,* 87 Md. 273, 280, 39 A. 872 (1898).

Item first of the will contains the usual directive that the just debts and funeral expenses of the testator be satisfied.

Item second demonstrates a strong desire on the part of the testator that the control and management of the two companies which he had built up over many years, namely Interstate and Lapsley, "be vested solely in my friend and business associate, Robert Wilson, upon the terms and conditions herein set forth * * *." In order to effectuate this purpose he directed his executors and trustees to deposit all of his Interstate and Lapsley stock with the Safe Deposit and Trust Company of Baltimore (now Mercantile-Safe Deposit and Trust Company) "in escrow" subject to an option in Robert Wilson to purchase these shares at their book value.

The stock was to be held by the Safe Deposit and Trust Company in escrow until the death of Mr. Wilson or un-

til he had exercised the privilege of purchasing it, or until both of the companies should have failed for one calendar year to pay dividends of not less than six per cent, or until title to the shares of stock became vested in various named legatees. Mr. Wilson was given the right to vote the stock while it was held in escrow so as to exercise management control over the two companies.

Item third of the will provided that Robert Wilson could only exercise his option to buy the stock by purchasing the testator's holdings in both companies in their entirety.

Item fourth restated the conditions set forth in item second to the effect that the option to purchase the stock would remain open to Robert Wilson only as long as the companies declared an annual dividend of not less than six per cent.

Item fifth directed that all dividends declared upon the stock held in Interstate and Lapsley should be paid from time to time, as and when declared, to the testator's widow.

Item sixth directed that the executors invest the proceeds of the sale of the testator's stock in Interstate and Lapsley in such a manner that at least $50,000.00 would be invested in United States Bonds, "and the balance in bonds secured by first mortgages on improved real estate and high grade investment securities of municipalities or of companies having established records for the payments of interest or dividends."

By items seventh, eighth and ninth, the testator made provisions which are identical except as to the named legatee and the amount of the gift, for his three friends, Edward H. Hehrlein, Norman R. Freeman and James Bright Kelly.

We set forth item seventh in full, as follows:

> "Seventh: Upon the death of my wife (provided my shares in said companies have not then been purchased by the said Robert Wilson or or otherwise disposed of pursuant to the provi-

sions of this my will), I direct my executors and trustees or the survivors or survivor of them to set apart and hold five hundred shares of Interstate Shade Cloth Company and one thousand shares of The Lapsley-Interstate Shade Cloth Company, in trust for the benefit of my friend, Edward H. Hehrlein, of Passaic, New Jersey, to pay to the said Edward H. Hehrlein the dividends declared upon such shares of stock from time to time during the lifetime of the said Robert Wilson or until my said executors and trustees shall have sold my shares of said stock in said companies either to the said Robert Wilson or any other party pursuant to the terms of this my will. Upon the death of the said Robert Wilson I direct my said executors and trustees and the survivor of them to deliver to the said Edward H. Hehrlein the said five hundred shares of Interstate Shade Cloth Company and one thousand shares of the Lapsley-Interstate Shade Cloth Company. If my said shares of stock in said companies shall have previously been sold, I then and in that event, direct my executors and trustees and the survivor of them to pay to the said Edward H. Hehrlein the proceeds of the sale of the stock herein bequeathed but without any accumulations of interest thereon. If my said shares of stock shall have been sold in the lifetime of my wife, I direct my executors and trustees, upon the death of my wife, to pay to the said Edward H. Hehrlein the proceeds of the sale of the stock herein bequeathed, but without accumulations of interest thereon."

Item eighth makes an identical disposition as item seventh, except the bequest is in favor of Norman R. Freeman, and in the amount of 250 shares of Interstate and 500 shares of Lapsley.

Item ninth makes an identical disposition in favor of

James Bright Kelly except that it involves only 200 shares of Lapsley and no Interstate.

Item tenth provided that, "Upon the death of my wife and subject to the provisions of this my will, I give and bequeath all of the shares of stock owned by me (not heretofore disposed of by items seventh, eighth and ninth) in said Interstate Shade Cloth Company and The Lapsley-Interstate Shade Cloth Company or the proceeds thereof, if the said shares of stock shall have been sold (which in fact occurred) in the lifetime of my wife, unto my sister, Selma J. Wolff, and to the said Edward H. Hehrlein, share and share alike."

Item eleventh provided that if Mrs. Wolff and Mr. Hehrlein, or either of them, should have predeceased the testator's widow then the shares of the person or persons so dying were bequeathed to Mr. Wilson.

Item twelfth and the last provision with which we are concerned provided, "All the rest, residue, and remainder of my estate, real and personal wheresoever situate, I give, devise and bequeath unto my wife, Lillian Anita Schoenherr, absolutely."

After the testator's death in 1924 his estate was duly administered by his executors and the Lapsley and Interstate stock transferred to his trustees. On February 21, 1929, Robert Wilson exercised the option extended to him under the terms of the will, paying $343,941.60 for the Lapsley stock or $82.48 per share and $293,993.28 for the Interstate stock or $194.44 per share. Accordingly, the proceeds of the sale of the stock in both companies amounted to $637,934.88 and this replaced the stock as the corpus of the trust created by the testator. The original trustees invested the proceeds of the sale only in bonds, but after the present trustees were appointed, investments were made in both stocks and bonds.

At this juncture we should comment on the fact that the phrases customarily used in connection with the establishment of a testamentary trust were all but ignored in the drafting of the will. The testator did not specify that there should be a corpus of a trust, a principal of

a trust, the income from a trust or principal, and no language was used to designate one party as a life tenant and other parties as remaindermen, nor did he provide for a gift of "corpus" or "principal" to anybody with or without using precise language designating remaindermen.

He simply provided for the gift of the shares themselves, or the proceeds of the sale of the stock bequeathed to the designated beneficiaries. However, despite the lack of precise and formal terms usually found in a testamentary trust, the testator did couple the use of the term "trustees" with that of "executors." There were also provisions in items seventh, eighth and ninth containing language generally applicable to trusts, to the effect that upon the death of the widow if the shares of the stock in Interstate and Lapsley had not been disposed of, then the shares of stock themselves were to be held "in trust" until the death of Wilson or until the sale of the stock. It is also quite evident from the instructions concerning how the proceeds of the sale of stock should be invested, that the testator intended that the proceeds of such a sale were to be considered the corpus of a trust. The trustees over the years simply endeavored to give practical effect to what they believed the testator intended to accomplish. Thus, although not specifically provided for in the will, all of the dividends both cash and stock, paid by the various corporations in which the trust corpus was invested, were paid to the widow for her life, as the trustees interpreted item sixth of the will (and correctly so) as giving the widow the income from the trust for life. As a matter of fact on this appeal none of the parties argue any contrary interpretations concerning the construction of the will until we reach the question of the disposition of the appreciation of the corpus.

Mrs. Wolff, the testator's sister, died March 9, 1941. She predeceased the widow and, under the provision of item eleventh, her one-half interest in the proceeds of the sale of the Lapsley and Interstate stock passed to Mr. Wilson. Robert Wilson died November 28, 1959.

Mrs. Staub, the testator's widow died on August 12, 1968. At the time of her death the corpus of the trust had increased in value from $637,934.88 on the date of Wilson's purchase of the stock in 1929, to $1,187,495.49. It is the disposition of the $549,560.61, representing the capital appreciation of the corpus, which has given rise to the present controversy.

Shortly after the widow's death in August of 1968, Mercantile wrote to her executors stating that they would pay to them the accrued income on the corpus up to the date of Mrs. Staub's death, which amounted to $5,066.89, on the condition that her executors execute a release to Mercantile of all claims to any distribution of Mr. Schoenherr's estate. Her executors refused to comply with this request and thereafter, Mercantile instituted the present proceeding for the construction of Schoenherr's will. The bill of complaint named as defendants the executors of the Staub estate, the executors of the Wilson estate, the executor of the Freeman estate, the executrix of the Kelly estate, Edward H. Hehrlein (presently living) and also unknown parties.

No appeal was taken from the chancellor's ruling that the various legatees named in items seventh through eleventh inclusive have fully vested remainders,[2] other than Mrs. Wolff and Mr. Hehrlein, the legatees designated in item tenth and eleventh. With regard to these later two, the chancellor found that each took a vested interest subject to divesture if either should predecease Schoenherr's widow and that pursuant to item eleventh, upon the death of Mrs. Wolff, her interest passed to Robert Wilson as a fully vested remainder and that upon Wilson's death, prior to the death of Mrs. Staub, this interest passed to Wilson's executor.

2. In *Pattie Tenny Kelly, as Executrix of James Bright Kelly, deceased, and individually v. Lillian Anita Staub, et al.,* Circuit Court for Baltimore City, Case No. 86A222/A29019, decided September 27, 1946, Daily Record, October 9, 1946, Niles J., the court decided that James Bright Kelly, the legatee in item ninth, had a vested remainder in the proceeds of the sale of 200 shares of Lapsley stock which, on his death in 1945, passed to his estate.

Thus, we find that the only issue before us on appeal is whether the remaindermen receive their designated shares in just the proceeds of the sale as paid to the trustees when Robert Wilson bought the stock in Interstate and Lapsley in 1929, or in addition thereto are to receive an aliquot portion of the capital appreciation. On the other hand, in the event the vested remaindermen were not to share in the capital appreciation, it would follow that this accretion would pass to Mrs. Staub's estate by virtue of her designation as residuary legatee under item twelfth of the will.

The appellants launch a trifurcated attack contending: (1) that the use repeatedly by the testator of the phraseology that the remaindermen should receive the "proceeds of the sale," with the added limitation, "but without any accumulations of interest thereon," stated a definite intention on the part of the testator that the remaindermen should not share in any accretion of the corpus; (2) that the instructions given by the testator as to the manner in which the proceeds were to be invested demonstrated that he did not consider the possibility of capital appreciation passing to his friends and business associates and there being no specific disposition of such accretion of corpus, it should pass by the residuary clause to the widow's estate; and finally (3) that at the time of the execution of the will, it could not have been then known whether Wilson would exercise his option to purchase the stock, and thus the stock may have been sold by the trustees at different times and in varying amounts, with the resulting investments and appreciation thereon being incapable of proportionate allocation to the named beneficiaries.

## I and II

In determining the proper construction which should be placed upon the term "proceeds of sale" we find ample authority that depending on the context in which it is used, the meaning may well be broad enough to include income from, as well as appreciation of, the principal of invested proceeds. In the case at bar we think the term

"proceeds of the sale of stock" in the context in which it is used was intended to mean a fund which formed the corpus of a trust. In *In re Cosgrave*, 225 Minn. 443, 31 N.W.2d 20, 28 (1948), the subject of an annotation in 1 A.L.R.2d 175, the Court had occasion to consider the construction to be placed on the word "proceeds" as the same may affect the shares of a life tenant and remaindermen. We think the following language used by the Court is most appropriate in the application of the term with regard to the facts of the case at bar:

> "In determining the meaning of the word 'proceeds' here, our aim should be to discover the meaning with which the testator used the word in expressing his testamentary intention. A word means what it manifests. This depends upon all factors that may shed light on the question, such as the etymology of the word, the subject matter to which it is applied, the context in which it is set, and the circumstances and time of its use. *Hibner v. City of St. Paul*, 219 Minn., 87, 16 N.W.2d 878. A word may be used with different meanings in the same will. *In re Estate of Douglas*, 149 Minn. 276, 183 N. W. 355. As said in *Edgerly v. Barker*, 66 N. H. 434, 450, 31 A. 900, 903, 28 L.R.A. 328, 'The context may show clearly that the testator meant to put two different senses upon the same word.' It has been said that the word 'proceeds' is one of 'great generality.' *Phelps v. Harris*, 101 U. S. 370, 380, 25 L. Ed. 855, 858. * * * The word 'proceeds' may mean either corpus or income depending on the intended meaning."

In *Seifert v. Kepner*, 227 Md. 517, 177 A. 2d 859 (1962), this Court found the word "proceeds," as used by a testator in directing his executors to dispose of stock and to distribute the proceeds to certain legatees, to be sufficiently broad in meaning as to include a liquidating dividend forwarded by check to the testator a few days

prior to his death but remaining uncashed at the time of death. The contention was made that the bequest had been adeemed by the declaration of the partial liquidating dividend. The Court held that there was a mere change in the form of the gift and that there was a clear intention to confer on the named legatees a monetary benefit or interest in the fund. Thus the Court concluded that the benefit survived the substitution and that the dividend was fairly within the meaning of the word "proceeds" as used in the will.

We see, therefore, that depending upon the context in which it is used the term "proceeds" can connote more than its literal meaning. In the instant case there were many factors which indicated that the "proceeds of sale" were to be administered as the corpus of a trust. These factors include the testator's directions that the stock be held in escrow and the dividends paid to his wife, the manner in which the proceeds were to be invested should the stock be sold before the wife's death, the fact that the income from such invested proceeds was to be paid to his wife, and the use of the words "trustees" in item seventh. All of these factors indicate the creation of a trust with provisions for the management of the corpus. Bogert, *Trust and Trustees*, Vol. 1, § 1. In view of these indicia of a trust, we have no doubt but that the proceeds were meant to form the corpus of a trust.

Once we accept the proposition that the "proceeds of the sale" were intended to form the corpus of the trust, then, we are satisfied that under the rationale of *Gay v. Kernan*, 229 Md. 481, 184 A. 2d 707 (1962), the vested remaindermen were entitled to receive the capital appreciation realized from the investment of the proceeds, with the exception of income by way of dividends or interest on the proceeds. These latter items were expressly excluded from the "proceeds of the sale" by the testator.

We find a striking analogy between the present case and that of *Gay v. Kernan, supra*. In *Gay*, just as in the case at bar, the will did not specifically provide for the disposition of the accretion that might take place in the

corpus of the trust. In that case the testator left $10,000.-
00 to the trustee, in trust, to invest that sum and from
the investments to pay the net income to A for life, and
after the death of A, to pay $5,000.00 to Kernan Hos-
pital and $5,000.00 to Union Hospital. During the life of
A the trust fund increased in value to $18,000.00. Upon
the death of A both the residuary legatee and the remain-
dermen claimed the capital appreciation. This Court held
that, on its face, the will disposed of the entire trust es-
tate and the remaindermen were entitled to the profit as
part of a trust corpus. Judge Henderson, later Chief
Judge, writing for the Court stated:

> "* * * Item 23 contained a residuary clause in
> favor of two cousins, both of whom survived
> the testatrix, but not the life tenant under item
> 3.
>
> The case presents a narrow question of con-
> struction. It is conceded that the remainders
> under item 3 were vested, and that, as against
> the life tenant, the remaindermen are entitled to
> the increase in value of the securities held, and
> to the income accruing subsequent to the death
> of the life tenant. See *Rosenburg v. Lombardi*,
> 222 Md. 346, 349 and *Caughy v. Safe Deposit
> & Trust Co.*, 196 Md. 252, 258. See also note 76
> A.L.R.2d 162. The appellants contend, however,
> that the remaindermen are limited by the pre-
> cise terms of the will to the cash amounts named
> in item 3, and that the balance should be dis-
> tributed under the residuary clause. They argue
> that the use of the figures $5,000 is so clear and
> unambiguous as to admit of no construction.
>
> Both parties rely upon the rules of construc-
> tion set out in *Hebden v. Keim*, 196 Md. 45, 51,
> but they disagree as to which of them is appli-
> cable. It has been held that a bequest in remain-
> der of a 'principal sum' includes the increment
> thereon. *In re Houston's Will*, 165 Atl. 132 (Del.

Ch.). And the cases almost uniformly hold that the mere use of figures instead of fractions, in dealing with a cash bequest in remainder, does not import a limitation on the quantum of the estate in remainder, or effect a gift over of the excess in favor of the residuary estate. This is particularly true where, as here, the initial fund was stated as a cash sum, and periodic investment and reinvestment was clearly within the contemplation of the testatrix." 229 Md. at 483, 484.

We think that in the instant case we have a parallel situation to the *Gay* case. Here the "proceeds of the sale" initially was a readily ascertainable sum just as was the $5,000.00 gift in trust to each hospital in the *Gay* case. In each instance there was a fixed and ascertainable corpus when the trust was created; nonetheless, in the *Gay* case the court experienced no difficulty in allowing each of the hospitals to share in the capital growth of the corpus. See also, *In re Low's Will*, 250 N.Y.S. 192, 178 N. E. 817 (1931).

Nor do we think that this interpretation is in anyway qualified by the testator's language that the remaindermen should receive the proceeds of the sale "but without any accumulation of interest thereon." What the testator meant by excluding the accumulation of interest is explained in the well reasoned opinion of Judge Joseph L. Carter who heard the case below. We think that Judge Carter was on target when he stated:

"The fact that the Testator used the words 'without accumulations of interest thereon' following the gift of the proceeds to the remaindermen has no bearing on the court's conclusion. The Testator simply meant to insure that all of the income was to be paid to the wife both from stock dividends and interest on bonds and none of the interest or income was to be accumulated in the corpus of the trust and thereby benefit

the remaindermen. In the case of *Ex Parte Humbird,* 114 Md. 627, the Court of Appeals limited the word 'interest' to nothing more than income from the corpus of the trust and did not include a realized profit on the sale of corpus property.

The law would seem to be in accord with the above conclusions. 'There can be little doubt that under the Maryland decisions, generally, the increase in the value of corporate stocks or securities realized by a trustee is regarded as capital gains and, therefore, treated as corpus. *Smith v. Hooper,* 95 Md. 16, 51 A. 844, 54 A. 95; *Girdwood v. Safe Deposit & Trust Co.,* 143 Md. 245, 122 A. 132; *Safe Deposit & Trust Co. v. Bowen, et al.,* 188 Md. 482, 53 A. 2d 413.' *Rosenburg v. Lombardi,* 222 Md. 346, 349."

There is no doubt that it was the express intention of the testator to provide financial security for his widow during her lifetime. He was interested in seeing that both Interstate and Lapsley stock paid six per cent annual dividends. He was also determined that the investments should be on the conservative side. He was not interested in what we today call "glamor" stock or "go-go" funds. However, such inherent caution does not justify the adoption of the conclusion that the testator was hostile to any capital growth in the trust which he created. The testator had been an eminently successful businessman. It is certainly most probable that he harbored the strong belief that the stock in his own company would appreciate from the date that the stock would be first placed in trust until purchased by Wilson or distributed by his trustees. As a matter of fact the stocks in both corporations did materially increase in value from the date when they were placed in trust shortly after the testator's death in 1924, and the intervening four years when they were purchased by Mr. Wilson in 1929.

In that interval the Interstate stock had increased,

over and above the value at which it was appraised in the inventory of Schoenherr's estate, by $85.44 per share and the Lapsley by $43.48. The testator was perfectly willing that the objects of his bounty, the friends who had worked with him in making his business a success, share in such capital appreciation. He did not limit them to sharing in only the appraised value of the stock of the two corporations at the time of his death, which he could well have done, but rather he bequeathed them a vested interest in the net proceeds to be realized from the sale of the stock, if and when it was sold, and which net proceeds in turn were to be used as the corpus of the trust from which his widow was to receive her income for life. The testator further knew that this trust for his wife as the life tenant might well continue for some years. It is but a logical step, following the rationale initially employed by the testator, to assume that he intended that the remaindermen, upon the death of the life tenant, would receive an aliquot share of the corpus created by the investment of the proceeds of the sale of the stocks. We think this proposition was well stated by Judge Carter in the lower court's opinion when he said:

"* * * If there had been capital appreciation over the years, as was surely anticipated by the Testator who from all the evidence appears to have been a sophisticated businessman, the remaindermen or their estates would have the benefit of such accretion. If, on the other hand, the stock had gone down in value, they would, of course, take the loss. By the same token, if the original proceeds had gone down in value rather than increased as they did, the remaindermen would take that loss and not be able to claim the larger sum of proceeds which may have existed in 1929. Certainly the executors of Mrs. Staub's estate don't take the position that had the value of the corpus from the proceeds been less than in 1929, they would make up the difference to the remaindermen.

> Put simply, the Testator did not intend to benefit Mrs. Staub's estate over that of the remaindermen when it came to the appreciation in the value of the corpus. He intended to dispose of the entire corpus by Items Seventh-Eleventh, and the Court finds that this in fact has happened with nothing left to the residuary legatee, the estate of Mrs. Staub."

Viewing the will in its entirety and the totality of circumstances surrounding its execution we do not think that the testator intended to pass any of the corpus of the trust, which he created by items second through eleventh, under item twelfth, the residuary clause. We think the testator intended to, and did, dispose of all of his principal assets before he reached item twelfth and that it was his intent that twelfth be a catchall provision for miscellaneous assets of little value. In actuality, when the will was probated in 1924, only $4,600.00 was distributed to the widow under the residuary clause, whereas at that time the value of the bequests embraced within items second through eleventh, including the corpus of the trust of which the widow was a life tenant, amounted to $327,438.00.

### III

The final contention raised by the appellants, and one which we find of little merit, is essentially a bootstrap argument predicated on the theory that if the stock of the corporations in question had been sold over a period of years then it would have been "a virtual impossibility to determine how much appreciation each remainderman should receive."

We do not perceive the validity of such an assumption. Simply because something does not readily lend itself to computation does not mean that it is impossible of calculation. As a practical matter it is also obvious that if Mr. Wilson had not exercised the option extended to him by the testator to buy all the stock in its entirety, there was little likelihood that anyone else would have been in-

terested in buying anything less than substantial control of the two companies. Both Interstate and Lapsley were small corporations with no apparent history of active trading of their shares on the market, and it is almost inconceivable that anyone would be interested in piece-meal acquisition of the stock of a small corporation without the assurance of control of management.

In accord with the views expressed in this opinion we think it would be a frustration of the testator's intent, as well as running contrary to the law as we view it, to hold that the remaindermen were not entitled to receive an aliquot share of the capital appreciation of the corpus originally represented by the proceeds of the sale of the Interstate and Lapsley stock.

*Decree affirmed, appellants to pay costs.*

