## BANGHART *v.* VIEWEG ET AL.

[No. 331, September Term, 1970.]

*Decided March 4, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Roger D. Redden* and *Ernest M. Thompson,* with whom were *Piper & Marbury* and *Miller, Wheeler, Thompson & Thompson* on the brief, for appellant.

*William H. Adkins, II,* with whom were *Henry, Henry & Adkins* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

We are here obliged to construe the will of the late Byron T. Banghart (Banghart) of Baltimore City. When a sale of the business previously carried on by The Baltimore Wholesale Grocery Company of Baltimore City (Baltimore Wholesale) was made, a question arose as to whether that sale was a termination of the trust created in Banghart's will. Appellant, Andrew Brittain Banghart (Andrew), brought a declaratory judgment action in Talbot County, naming as parties defendant the trustees of the trust created under the will and the potential beneficiaries. The chancellor (Clark, J.) held the trust did not terminate. We shall affirm that decree.

By the second item of the will, 5135 shares of the common stock of Baltimore Wholesale and 1000 shares of its 6% preferred stock were left to certain trustees. They were to pay the income to a son, Byron Downard Banghart, for life, with the provision that if the son did not survive Banghart by 20 years, the trust was to continue until 20 years after the testator's death, with the income going equally to the son's wife and children. He further provided that the son's wife and children were to be the distributees of the trust estate upon termination. The second and last paragraph of that item said:

"My Trustees shall, in their discretion, have full power to exercise their voting rights as pertains to the stock held in trust. I have named Five Trustees because the majority of them have been associated with me at the Baltimore Wholesale Grocery Company for a long period of time and they are fully acquainted with my methods of conducting said business. The decision of the majority of my Trustees shall govern in the exercise of the voting rights of the stock. Upon the death or resignation of any one of the aforesaid Trustees, all powers and duties under this trust shall vest in the surviving or remaining Trustees as the case may be. I have full knowledge that some of the aforesaid Trustees are officers and employees of the Baltimore Wholesale Grocery Company, but that fact shall not bar them from acting as Trustee under this trust. If, hereafter, any one of the Trustees shall become an officer of the Baltimore Wholesale Grocery Company or a director of said company, this act shall not bar said officer or director from acting in his capacity as Trustee. The Trustees set out aforesaid in this Trust shall receive no remuneration for acting in their capacity as Trustees. Further, the said Trustees shall incur no liability in the administration of this trust by reason of the keeping of the assets of said trust intact as stock."

The will was executed November 5, 1949. On May 16, 1950, Banghart executed the codicil which provokes this controversy. The second paragraph of the codicil stated:

"Whereas, by my said Last Will dated November 5, 1949 in Item Second I have established a trust estate naming the said beneficiaries and appointing said trustees, with certain powers and duties to perform which are set out in detain [sic] in my said Will, I do hereby em-

power and give my said trustees in Item Second of my Will, the power to sell the corpus of said trust estate, in their discretion, at any time after the said trust estate has been in operation for a period of three years after my death. If, in their discretion, the said trustees shall exercise their power and sell the corpus of said trust estate, said sale shall be at the highest price obtainable and no sale shall be made at less than the book value of the stock forming the corpus of said trust. After such sale, the trust shall terminate; and after the payment of the necessary costs of such sale, the net proceeds thereof shall be divided equally between my two sons, Byron Downard Banghart and Andrew Brittain Banghart."

The parties have stipulated: the trust assets are 5135 shares of the common stock and 1000 shares of the 6% preferred stock of Baltimore Wholesale; there were issued and outstanding as of December 26, 1968, 9631 shares of common stock and the trustees, therefore, own 53% of all outstanding common stock; as of the same date there were 1131 shares of 6% preferred stock outstanding and the trustees, therefore, own 88% of that stock, which is nonvoting; as of the same date there were 63,576 shares of 7% preferred stock, none of which was owned by the trustees and which stock is nonvoting; Banghart died September 23, 1950; on December 23, 1968, the directors and on December 26, the stockholders, approved a sale of the inventory, trucks, tractors, trailers, automobiles, and all accounts receivable of Baltimore Wholesale to P. A. & S. Small Company (Small) of York, Pennsylvania, for which Small executed a note to Baltimore Wholesale in the amount of $599,777.17 dated February 4, 1969; excluded from the sale was warehouse and office equipment together with lands owned by Baltimore Wholesale; and Baltimore Wholesale has not been dissolved and still exists as a corporate entity.

Andrew contends that the sale to Small was an event

which terminated the trust. He offered evidence which was intended to show that the testator intended the trust to terminate if Baltimore Wholesale disposed of all of its operating assets and ceased to conduct a wholesale grocery business. The evidence was admitted over objections. The court reserved its ruling on the objections. When the chancellor gave his opinion he said relative to this evidence:

> "It is now our considered opinion that these objections are meritorious and we sustain them. Therefore, any facts brought out at said hearing not included in the body of this Opinion are hereby deleted from the record as being either irrelevant to the issue or falling within the ambit of the rule precluding the admission of extrinsic evidence to show the intention of the testator except in the case of latent ambiguities."

As far back as *Walston v. White*, 5 Md. 297 (1853), Chief Judge Le Grand said for our predecessors:

> "The rule is this: where the language of the testator is plain and unambiguous such language must govern, and therefore extrinsic evidence is inadmissible to show that he *meant* something different from what his language imports; but any evidence is admissible, which, in its nature and effect, simply *explains* what the testator *has* written; 'in other words, the question in expounding a will is not [-W]hat the testator meant? as distinguished from [-W]hat his words express [?] but simply [-W]hat is the meaning of his words? And extrinsic evidence, in aid of the exposition of his will, must be admissible or inadmissible with reference to its bearing upon the issue which this question raises.' *Wigram's Rules of Law*, 9." *Id.* at 304-5. (Emphasis in original.)

See also *Monmonier v. Monmonier*, 258 Md. 387, 390,

266 A. 2d 17 (1970) ; *First National Bank v. White,* 239 Md. 289, 298, 211 A. 2d 328 (1965) ; *Jones v. Holloway,* 183 Md. 40, 46-47, 36 A. 2d 551 (1944) ; and Miller, *Construction of Wills,* §§ 10, 40, 41 and 43 (1927).

In *Hebden v. Keim,* 196 Md. 45, 75 A. 2d 126 (1950), Judge Delaplaine said for the Court:

> "We recognize, of course, that the Court, in construing a will, is governed, not by what the Court may think the testator wanted to say, but by what his words actually meant, because his words were designed to express his intention. *Larmour v. Rich,* 71 Md. 369, 381, 18 A. 702; *Abell v. Abell,* 75 Md. 44, 58, 23 A. 71, 25 A. 389; *Ahalt v. Hersperger,* 75 Md. 88, 91, 23 A. 66; *Slingluff v. Johns,* 87 Md. 273, 276, 39 A. 872; *Robinson v. Bonaparte,* 102 Md. 63, 71, 61 A. 212; *Schapiro v. Howard,* 113 Md. 360, 370, 78 A. 58, 140 Am. St. Rep. 414. The expressions in a will must be interpreted in their ordinary and grammatical sense; and if the language is plain and unambiguous, the Court cannot give it a different meaning in order to give effect to a mere conjecture as to the testator's intention." *Id.* at 51.

In *Schapiro v. Howard,* 113 Md. 360, 78 A. 58 (1910), Judge Pearce said for the Court:

> "In *Barrington v. Tristram,* 6 Vesey, Jr., 345, there was a bequest upon trust for the benefit 'of all and every the child or children' of the testator's niece 'Mrs. Tristram, the wife of the Rev. Thomas Tristram,' distribution to be made at a certain period. Before that period, the Rev. Thos. Tristram died, and Mrs. Tristram married again and had a child by her second marriage. When the period for distribution arrived, the Tristram children claimed the whole estate, and the child of the second marriage claimed a dis-

tributive share. Lord Eldon held such child entitled to a share, saying that upon the general rule a child by a subsequent marriage was included, 'since the testator has given to persons whom the law makes certain.' In the course of his opinion he said: 'My private opinion is, he never thought of his niece marrying again, but the object was the children of Mrs. Tristram. The words "the wife of the Rev. Thomas Tristram," are merely words of description * * * and notwithstanding a strong conjecture against my judicial opinion, I am bound to declare that every child of Mrs. Tristram shall take.' This case is not only a high authority illustrating the general rule applicable to the question, but it emphasizes the obligation to give effect to the testator's expressed intentions, and not to indulge conjecture however strong." *Id.* at 371-72.

Applying those rules, we turn to the case at bar. Here we have no need to seek a definition of the word "corpus" to which the testator referred in providing for termination of the trust upon sale of "the corpus of said trust estate", since in the very section under consideration the testator made abundantly plain what he meant by that term. He stated:

"[S]aid sale shall be at the highest price obtainable and no sale shall be made at less than the book value of the *stock forming the corpus of said trust*." (Emphasis added.)

He provided that upon "such sale", meaning sale of the stock, "the trust shall terminate". One would have to strain hard to construe this language as meaning that the sale of the business of Baltimore Wholesale should be equated with sale of its stock. "[A]rguments based upon the supposed or known wishes of a testator in respect to the disposition of his property are not to be considered,

unless such wishes are expressed in his will. The short answer, says Chancellor Kent, which courts are so often compelled to make to such arguments, is, *'voluit, sed non dixit.'* " [1] *Abell v. Abell*, 75 Md. 44, 57, 23 A. 71 (1891). Accordingly, there was no error on the part of the chancellor.

> *Decree affirmed; appellant to pay the costs.*

---

1. Black's Law Dictionary (4th ed. 1951) defines the term: "He willed, but he did not say. He may have intended so, but he did not say so. A maxim frequently used in the construction of wills, an answer to arguments based upon the supposed intention of a testator."